UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

GERARD JENKINS,

                      Plaintiff,

      -against-

CORRECTION OFFICER J. CORDERO,
CORRECTION OFFICER MAYFIELD,
HEARING OFFICER: ASSISTANT DEPUTY
SUPERINTENDENT OF PROGRAMS J. WOOD,

                      Defendants.
------------------------------------------------------------X

**OPINION AND ORDER**

17 Civ. 1592 (JCM)

      Plaintiff Gerard Jenkins ("Plaintiff") proceeding *pro se* commenced this action pursuant to 42 U.S.C. § 1983 alleging violations of his Eighth Amendment and Fourteenth Amendment rights.[1] (Docket No. 2). The Court held an evidentiary hearing on January 30, 2019 on the issue of whether Plaintiff exhausted his administrative remedies under the Prison Litigation Reform Act ("PLRA"). The parties submitted post-hearing briefs.[2] For the reasons set forth below, after hearing the testimony and considering the post-hearing briefs, the Court finds that Plaintiff has satisfied the exhaustion requirements of the PLRA.

**I. BACKGROUND**

**A. Procedural Background**

      On March 2, 2017, Plaintiff filed a complaint alleging (i) correction officers Cordero and Mayfield used excessive force against him while he was incarcerated at Sing Sing Correctional Facility ("Sing Sing"); and (ii) defendant Deputy Superintendent of Programs Wood violated his

---

[1] This action is before this Court for all purposes on the consent of the parties, pursuant to 28 U.S.C. § 636(c). (Docket No. 47).

[2] The parties' briefs are hereinafter referred to as "Pl. Br." and "Defs. Br." respectively. (Docket Nos. 68, 72). All page number citations refer to the one assigned upon electronic filing.

1

due process rights by improperly disciplining him on allegedly false charges. (Docket No. 2). Defendants moved to dismiss the complaint against them claiming that Plaintiff failed to exhaust his administrative remedies with respect to his Eighth Amendment claim and did not plausibly allege his Fourteenth Amendment claim. (Docket No. 14). The Honorable Vincent L. Briccetti denied the motion to dismiss as to the Eighth Amendment excessive force claim against defendants Cordero and Mayfield, holding that dismissal for failure to exhaust administrative remedies was unwarranted at the pleading stage. *Jenkins v. Cordero*, No. 17 Civ. 1592 (VB), 2018 WL 456311, at *3 (S.D.N.Y. Jan. 17, 2018).[3] Judge Briccetti granted the motion to dismiss as to the Fourteenth Amendment claim against defendant Wood, finding that Plaintiff failed to plausibly allege this claim. *Id.* at *3-4.

Following the close of discovery, Defendants requested an evidentiary hearing to determine whether Plaintiff exhausted his administrative remedies given the dispute over whether Plaintiff ever attempted to file a grievance within the timeframe required by the Department of Corrections and Community Supervision ("DOCCS"). (Docket No. 36). Judge Briccetti granted Defendants' request for an evidentiary hearing, and the parties subsequently consented to proceed before the undersigned for all purposes. (Docket No. 47). This Court held an evidentiary hearing on January 30, 2019, and the parties submitted post-hearing briefs.

## B. Factual Background

Plaintiff alleges that on August 31, 2015 he was assaulted by CO Cordero and CO Mayfield while his wife was visiting him at Sing Sing. (Compl.; Tr. 110:11-14). CO Cordero filed a misbehavior report against Plaintiff, and after a disciplinary hearing, Plaintiff was placed

---

[3] In accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) and Local Rule 7.2 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York, a copy of this case and other cases, *infra*, that are unpublished or only available by electronic database, accompany this opinion and shall be simultaneously delivered to *pro se* Plaintiff.

in the special housing unit ("SHU").[4] (Compl. Ex. A; Tr. 110:15-21). Plaintiff testified that on September 2, 2015, while he was in the SHU, he submitted a grievance related to the alleged assault. (Tr. 103:20-104:4, 112:2-10; Defs. Ex. 1). Plaintiff claims that after he did not receive a response or a grievance number, he submitted a second grievance on October 5, 2015. (Tr. 112:5-7; Defs. Ex. 1). Plaintiff testified that in both instances, he submitted the grievances while in the SHU by handing his grievances to the correction officer who came around with the daily mailbox. (Tr. 111:7-112:18). At the evidentiary hearing, Plaintiff did not know the identity of the correction officer he gave his September 2, 2015 grievance to, but he described her as a tall female correction officer whose name began with the letter R. (*Id.* at 119:19-20; 115:24-116:8). Plaintiff could not recall if the same correction officer picked up the grievance on October 5, 2015, but he recalled giving his grievance to a female correction officer. (*Id.* at 122:2-124:4).

Plaintiff was released from the SHU on November 10, 2015. (Tr. 112:13-15). Upon his release, he asked inmate Vincent Warren, the prison grievance representative, about the status of his grievances. (Defs. Ex. 1). Mr. Warren told Plaintiff that he remembered filing his grievance, but later informed him that the grievance had not been filed. (*Id.*). According to Plaintiff, on November 24, 2015, he spoke with the grievance supervisor, Quandera Quick, who informed Plaintiff that his grievances had not been received and the time to file them had passed. (*Id.*). That same day Plaintiff submitted another grievance concerning the procedures used for collecting grievances and indicated that his grievances were not being filed. (*Id.*).

At the evidentiary hearing, Ms. Quick explained that there are two ways an inmate housed in the SHU can file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). (Tr. 20:18-21). First, the inmate could "hand-deliver the grievance to the Grievance

---

[4] Plaintiff appealed the results of his disciplinary hearing, and the director of inmate disciplinary programs reversed the disciplinary determinations on February 13, 2017. (Compl. Ex. C).

3

Sergeant while he or she makes rounds." (*Id.*). Second, the inmate could "place [the grievance] in the mailbox that's in the housing unit." (*Id.*). With respect to the second option, Ms. Quick explained that a correction officer will bring the mailbox around to the entire facility, including the SHU, and then bring the mailbox to the mailroom, who in turn sends any grievances to the grievance office. (*Id.* at 21:2-18). In this case, Plaintiff testified that he used the second method of filing a grievance when he handed his grievance to the correction officer assigned to general mail collection in the SHU. (*Id.* at 111:7-112:18).

Ms. Quick explained that once the grievance office receives a grievance, she processes it in accordance with Directive 4040. (Tr. 15:6-9). Specifically, Ms. Quick reviews the grievance, codes it based on the nature of the allegations, and then gives it to the grievance clerk to assign a grievance number that is entered into a computer database. (*Id.* at 15:9-16:7). Once a grievance is given a number and entered into the database, it is considered filed. (*Id.* at 16:6-8).

Ms. Quick testified that she had no recollection of receiving or filing the subject grievances from Plaintiff. (Tr. 26:11-18). She also reviewed the grievance office's database and confirmed that Plaintiff's alleged grievances from September 2, 2015 and October 5, 2015 had not been filed. (Tr. 33:2-5; Defs. Ex. 3). Ms. Quick did, however, receive Plaintiff's November 24, 2015 grievance, in which he stated that his grievances were not being filed. (Tr. 26:22-25; Defs. Ex. 1). Upon receiving Plaintiff's November 24, 2015 grievance, Ms. Quick consulted with Mr. Warren about whether the grievance office had received Plaintiff's prior grievances. (Tr. 29:14-30:2). On December 1, 2015, Mr. Warren wrote a letter to Ms. Quick stating that he had never seen the grievances Plaintiff was asking about. (Defs. Ex. 2). However, Mr. Warren recanted the statement in his letter at the evidentiary hearing and testified that he wrote that he

had never seen Plaintiff's grievance because he was afraid of being fired from his position at the grievance office if he admitted that he saw the grievance. (Tr. 67:18-68:3, 76:22-77:20).

Inmate John Hale, who served as a grievance file clerk at the time, also testified that he remembered seeing a grievance concerning an assault that took place on the visit floor with CO Cordero, but he could not remember if the grievance was the November 24 grievance or the September 2 or October 5 grievances. (Tr. 100:7-102:8).

## II. LEGAL STANDARDS

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The PLRA's exhaustion requirement is "mandatory," therefore "foreclosing judicial discretion." *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016). "[P]roper exhaustion . . . means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." *Hernandez v. Coffey*, 582 F.3d 303, 305 (2d Cir. 2009) (citing *Woodford v. Ngo*, 548 U.S. 81, 90 (2006)). "The exhaustion inquiry thus requires that we look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures." *Espinal v. Goord*, 558 F.3d 119, 124 (2d Cir. 2009).

In New York State, a prisoner must comply with the rules of New York's Inmate Grievance Program ("IGP"). To exhaust a claim, a prisoner must complete the following three steps: (1) submit a complaint to the clerk of the facility's IGRC within twenty-one days of the alleged incident; (2) appeal an adverse decision to the superintendent of the facility within seven days of receipt of the IGRC's written response; and (3) appeal an unfavorable decision by the

5

superintendent to the Central Office Review Committee within seven days of receipt of the superintendent's written response. 7 N.Y.C.R.R. § 701.5. A prisoner who has not received a response within the prescribed timeframe may appeal to the next level. *Id.* § 701.6(g)(2).

Because Plaintiff's failure to exhaust administrative remedies is an affirmative defense, Defendants bear the initial burden of establishing that a grievance process existed and applied to the alleged dispute. *See Hubbs v. Suffolk Cnty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015). Defendants can meet their burden by "pointing to 'legally sufficient source[s]' such as statutes, regulations or grievance procedures." *Id.* (quoting *Mojias v. Johnson*, 351 F.3d 606, 610 (2d Cir. 2003)). If Defendants satisfy their initial burden, the burden shifts to Plaintiff to demonstrate "that other factors . . . rendered a nominally available procedure unavailable as a matter of fact." *Id.*

In *Ross*, the United States Supreme Court identified "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." 136 S. Ct. at 1859. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* Third, an administrative procedure is unavailable when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

Shortly after the Supreme Court's decision in *Ross*, the Second Circuit elaborated upon the "opaqueness" exception in *Williams v. Priatno*, 829 F.3d 118 (2d Cir. 2016). In *Williams*, an inmate housed in the SHU satisfied the PLRA's exhaustion requirement when he handed a

grievance to a correction officer who then failed to file it. The Second Circuit explained that "[o]n their face, the regulations only contemplate appeals of grievances that were actually filed." *Id.* at 124. Because the plaintiff's grievance was not filed, it was "practically impossible for him to ascertain whether and how he could pursue his grievance." *Id.* Therefore, the Second Circuit concluded that "the regulatory scheme . . . [was] 'so opaque' and 'so confusing' that . . . no reasonable prisoner can use [it].'" *Id.* (quoting *Ross*, 136 S. Ct. at 1859). Since *Williams*, numerous courts in this Circuit have followed its reasoning when assessing the "inescapable quandary that inmates find themselves in when their grievances are not filed." *McRae v. Cordero*, No. 15 Civ. 4334 (NSR)(PED), 2018 WL 3611964, at *6 (S.D.N.Y. July 26, 2018); *see also Ortiz v. Annucci*, No. 17 Civ. 3620 (RJS), 2019 WL 1438006, at *8 (S.D.N.Y. Mar. 29, 2019) ("If, in fact, Plaintiff timely attempted to file his grievance by handing it to an officer while in SHU and that officer failed to file the grievance, Plaintiff's avenues for pursuing the grievance would be unavailable under *Williams*, excusing him from any further exhaustion requirements."); *Terry v. Hulse*, No. 16 Civ. 252 (KMK), 2018 WL 4682784, at *9-10 (S.D.N.Y. Sept. 28, 2018); *Jackson v. Downstate Corr. Facility*, No. 16 Civ. 267 (NSR), 2018 WL 3650136, at *8 (S.D.N.Y. July 31, 2018).

## III. DISCUSSION

Defendants have met their initial burden of demonstrating that a grievance process existed and applied to the instant dispute. *See* 7 N.Y.C.R.R. § 701.5. The Court next addresses whether that grievance process was unavailable to Plaintiff within the meaning of the framework established by *Ross*.

Plaintiff argues that he has demonstrated the second *Ross* unavailability exception, the "opaqueness" exception. (Pl. Br. at 4). Plaintiff likens this case to *Williams*. He argues that he

7

attempted to timely file his grievance regarding the August 31, 2015 incident while in the SHU by submitting his grievance through Sing Sing's mail system, which entails placing his grievance in the mailbox brought around by one of the correction officers on duty. (*Id.*). Plaintiff maintains that once he filed his grievance through Sing Sing's mailing system it was "out of [his] hands" and the regulations do not describe a mechanism for appealing an unfiled grievance. (*Id.*).

The regulations analyzed by the Second Circuit in *Williams* are the same regulations as the ones here. 829 F.3d at 125-26 (citing 7 N.Y.C.R.R. §§ 701.5, 701.6, 701.8). Defendants do not contest the applicability of the *Williams* analysis to the instant case. Instead, they maintain that Plaintiff failed to complete any step of the grievance process and challenge his claim that he timely attempted to file a grievance while housed in the SHU. (Defs. Br. at 8-11). Defendants question Plaintiff's credibility, noting (1) Plaintiff had no issue filing other grievances while in the SHU; (2) Plaintiff did not explain why he inquired about the status of a separate grievance while failing to mention the September 2 and October 5 grievances; and (3) Plaintiff failed to adequately explain why he did not have copies of the grievances in question. (Defs. Br. at 10-11).

The pertinent factual issues that this Court must decide under *Williams* are whether Plaintiff attempted to file his grievance in the prescribed time and manner, and whether his grievances nonetheless remained unfiled.

**A. Plaintiff Attempted to File His Grievance Using the Proper Administrative Procedures**

Plaintiff was initially required to submit a grievance to IGRC within twenty-one days of the August 31, 2015 incident. The Court credits Plaintiff's testimony that he attempted to file a grievance while in the SHU within the twenty-one-day period for several reasons. Plaintiff gave specific details about how on September 2, 2015, he handed the grievance to the correction officer who came around with the mailbox and did so again on October 5, 2015 when he did not

8

receive a grievance number. Plaintiff's account was consistent with Ms. Quick's description of the procedure for filing a grievance from within the SHU. The Court bases its credibility determination in part on Plaintiff's demeanor, body language and tone of voice during his testimony. Other facts in the record further support a finding that Plaintiff attempted to file his grievance within the mandated timeframe. For example, once Plaintiff was released from the SHU, he immediately followed up with the inmate grievance representative about the status of his grievances, and he then raised his prior grievances with the civilian grievance supervisor to see if they were ever filed. Furthermore, Plaintiff's testimony that he handed his grievance to the correction officer on mail duty remained unrebutted. For example, CO Maribel Lopez, the correction officer Defendants called to testify that Plaintiff did not attempt to mail a grievance while in the SHU, could not recall if she was the correction officer assigned to mail collection on the dates in question. (Tr. 57:1-11; 58:3-4).

The evidence cited by Defendants that Plaintiff failed to exhaust his administrative remedies does not undermine Plaintiff's testimony. First, the evidence that Plaintiff filed other grievances while in the SHU shows that Plaintiff knew how to competently follow the correct grievance procedures available to him. *See Ortiz*, 2019 WL 1438006, at *9 ("If anything, Plaintiff's understanding of how the IGP process functions in the ordinary course bolsters the inference that the usual process did not unfold in this circumstance by suggesting that the filing failure did not result from Plaintiff's own ineptitude.").

Second, Defendants argue that Plaintiff's credibility is undermined by the fact that he filed a written complaint when he did not receive a grievance number in connection with a separate grievance regarding the Family Reunion Program ("FRP"), (Defs. Ex. 6), but he did not file a similar complaint with respect to the September 2 and October 5 grievances. (Defs. Br. at

10). The Court showed Plaintiff Defendants' Exhibit 6 and asked him why he requested a number for the FRP grievance but did not include the September 2 grievance in his request. (Tr. 108:9-109:17). Plaintiff testified that he specifically requested a number for the FRP grievance because he was preparing for a hearing regarding the FRP incident. (*Id.*). However, he did not think of requesting a number for the September 2 grievance at that time. (*Id.*). In any event, Plaintiff submitted written complaints regarding his September 2 grievance once he learned it had not been filed, and he promptly spoke with members of the grievance office in person once he was released from the SHU. (*See* Defs. Exs. 1, 4).

Third, Defendants maintain that Plaintiff does not offer a sufficient explanation for why he does not have copies of the September 2 and October 5 grievances. (Defs. Br. at 11). However, the Court credits Plaintiff's explanation that he typically keeps copies of his grievances, but his property bag was lost during transit and he no longer has any of his paperwork. (Tr. 10:4-7; 125:8-12).

Accordingly, based on Plaintiff's credible testimony, the Court finds that Plaintiff attempted to timely file his grievance relating to the August 31, 2015 incident in accordance with proper administrative procedures.

## B. Plaintiff's Grievance Was Never Filed

The evidence demonstrates that Plaintiff's grievances were not filed, even though he mailed his grievances in accordance with the IGP. Plaintiff did not know why his grievances were not filed, but once he mailed them, they were within DOCCS' possession and out of Plaintiff's control.[5] In such circumstances, the grievance process became unavailable to

---

[5] At the evidentiary hearing, Mr. Warren testified that Ms. Quick, the civilian grievance supervisor, tampered with grievances and prevented certain grievances from being filed. (Tr. 66:24-67:17). Such actions, if they took place, would certainly render the grievance process unavailable to Plaintiff under both the second and third unavailability exceptions. Defendants spend a significant portion of their post-trial brief challenging Mr. Warren's testimony.

Plaintiff, thereby excusing him from pursuing further exhaustion requirements. *See Curtis v. Bola*, No. 15 Civ. 718 (GLS)(TWD), 2017 WL 6767392, at *13 (N.D.N.Y. Nov. 28, 2017), *report and recommendation adopted by*, No. 15 Civ. 718 (GLS)(TWD), 2018 WL 278673 (N.D.N.Y. Jan. 3, 2018) (the PLRA did not bar plaintiff's claims where he mailed his grievance in accordance with the IGP "and for reasons unknown to him and through no fault of his own, those [grievances] did not end up in the IGP files.").

## IV. CONCLUSION

For the foregoing reasons, the Court finds that Plaintiff has met the PLRA's exhaustion requirement, and dismissal of his claim is not warranted. The Court schedules a Pre-Trial Conference for June 20, 2019 at 10:00 a.m. in Courtroom 421 in the United States Courthouse, 300 Quarropas Street, White Plains, New York 10601. Due to *pro se* Plaintiff's incarceration, Defendants are directed to arrange Plaintiff's telephonic participation at the aforementioned time and date. The Clerk of Court is directed to mail a copy of this order to the *pro se* Plaintiff.

Dated: May 15, 2019
        White Plains, New York

**SO ORDERED:**

_____
JUDITH C. McCARTHY
United States Magistrate Judge

---

There is insufficient evidence for the Court to make a factual finding that Plaintiff's grievances were intentionally destroyed. However, intent is not a requirement under the "opaqueness" unavailability exception enunciated by *Williams*. Thus, the absence of evidence that Plaintiff's grievances were willfully destroyed by a prison administrator does not defeat Plaintiff's claim that the grievance process was unavailable to him.